IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

(1) JOAN BROWN, Individually and as    )
    Personal Representative of the Estate of  )
    William Robert Brown, Deceased,    )
                            )
          Plaintiff,           )
                            )    Case No. 21-cv-00098-JED-JFJ
v.                        )
                            )
(1) UNITED STATES OF AMERICA,    )
                            )
          Defendant.        )

## COMPLAINT

COMES NOW the Plaintiff, Joan Brown (hereafter "Plaintiff" or "Claimant" or "JB"), both individually and as the Personal Representative of her late husband, William Robert Brown (hereafter "WRB" or "Decedent" or "Patient"), and for her cause of action against the United States of America (hereafter "USA" or "VA"), does allege and aver the following facts.

## I.

## Parties, Jurisdiction, Service of Process, and Venue

1.1     This is a medical negligence and wrongful death lawsuit arising from sub-standard medical care provided by employees and agents of the Department of Veterans Affairs at multiple Oklahoma VA facilities, but mainly at Ernest Childers VA Outpatient Clinic, located at 9322 East 41st Street, Tulsa, Okla. (hereafter "VA-Tulsa").

1.2     Most of the VA medical care at issue in this claim was performed in Tulsa County, Oklahoma. Some medical care was performed at VA facilities in Muskogee County and Oklahoma County.

1.3     The Plaintiff is now a resident of Tulsa County, Okla., and had been a Tulsa County resident at all relevant times.

1.4     WRB was a resident of Tulsa County, Oklahoma, throughout the time period of his VA medical care, and on the date of his death on November 16, 2013.

1.5     The Plaintiff is the widow of the deceased veteran, William Robert Brown, and she is the court-appointed Personal Representative of the Estate of her late husband, WRB – having been so appointed by the Tulsa County, Oklahoma, Probate Court on 12/21/15, Tulsa County, Okla., Case No. PB-2015-934.

1.6     The Defendant is the United States of America.

1.7     The Federal District Court has jurisdiction of this cause, because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b) and 2671-2680, commonly known as the "Federal Tort Claims Act," which vests exclusive subject matter jurisdiction of Federal Tort Claims litigation in the Federal District Court.

1.8     The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and the Plaintiff's Complaint on Clint Johnson, Acting United States Attorney for the Northern District of Oklahoma by certified mail, return receipt requested, at his office located at 110 West 7th Street, Suite 300, Tulsa, Okla., 74119-1013, to the attention of the Civil Process Clerk, and by serving a copy of the Summons and Plaintiff's Complaint on Monty Wilkinson, Acting Attorney General of the United States, by certified mail, return receipt requested, at the Attorney General's office, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, D.C., 20530-0001, to the attention of the Civil Process Clerk.

1.9     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) as the United States is a Defendant and because a substantial part of the events and omissions giving rise to this claim occurred in this district.

## II.

### Liability of the United States

2.1     This case is commenced and prosecuted against the United States of America pursuant to and in compliance with 28 U.S.C. §§ 2671-2780, commonly referred to as the "Federal Tort Claims Act." Liability of the United States is predicated specifically on 28 U.S.C. §§ 1346(b)(1) and 2674 because the personal injuries, wrongful death, and resulting damages of which complaint is made, were proximately caused by the negligence, wrongful acts, and/or omissions of employees of the United States of America at VA-Tulsa, while acting within the scope of their office or employment, under circumstances where the United States of America, if a private person, would be liable to the Plaintiff in the same manner and to the same extent as a private individual under the laws of the State of Oklahoma.

## III.

### Jurisdictional Prerequisites

3.1     Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the Plaintiff's claims as set forth herein were filed with and presented administratively to the Defendant's agency, the Department of Veteran's Affairs, on 10/16/15, and received by the VA on 10/29/15.

3.2     On 2/16/16, the VA denied this claim by written letter to Claimant on that date, for reasons of alleged untimeliness: the VA asserted that, when applying the Oklahoma law of limitations and wrongful death to the facts of Claimant's case, JB's claim was presented too late.

3.3     On 8/1/16, Claimant timely appealed administratively from the VA's adverse determination of 2/16/16. Claimant alleged that the VA had incorrectly analyzed the Oklahoma law of wrongful death and limitations, and that her claim had, in fact, been timely submitted.

3.4     On 5/17/17, an attorney for the VA, Lawrence Stunkel, Esq., phoned Claimant's counsel to inform the Claimant that the VA had reviewed Claimant's appeal and that the VA agreed with Claimant's legal analysis, and that JB's claim was, indeed, timely filed. Mr. Stunkel reported that the VA would thereafter commence to evaluate the merits of the claim – *i.e.*, the issues of medical negligence; existence of medical causation; and the question of the nature and amount of the damages suffered by WRB, by WRB's widow, and by WRB's children.

3.5     Three years later, on 3/20/20, Mr. Stunkel phoned Claimant's counsel to inform Claimant that his office had completed the VA's review of this claim, and to offer settlement. Discussions regarding settlement ensued over several months without success. On 9/15/20, the VA denied JB's claim (*see* attached letter of denial dated 9/15/20 at Exhibit "A").

3.6     This lawsuit is timely pursuant to 28 U.S.C. § 2401(b). Plaintiff has complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this litigation.

**IV.**

**The Department of Veterans Affairs is an Agency of the United States**

4.1     The Department of Veterans Affairs is an agency of the United States of America. The United States of America, the Defendant herein, through its agency, the Department of Veterans Affairs, at all times relevant hereto, owned, operated, and controlled the healthcare facility known as Ernest Childers VA Outpatient Clinic ("VA-Tulsa") located at 9332 East 41st Street, Tulsa, Okla., and through its agency, the Department of Veterans Affairs staffed said healthcare facility with its agents, servants, and/or employees.

## V.

### Employment and Course and Scope

5.1     At all times material hereto, all persons involved in the medical and health care services provided to the Plaintiff's husband WRB at VA-Tulsa were agents, servants, and/or employees of the Department of Veterans Affairs, or some other agency thereof, and were at all times material hereto, acting within the course and scope of such employment.

## VI.

### Facts

6.1     This is a Federal Tort Claims Action for monetary damages sustained by Plaintiff resulting from personal injury and the wrongful death of WRB as a result of substandard and, therefore, negligent medical care.

6.2     This claim concerns substandard medical care provided by agents, servants, and employees of the United States government at VA-Tulsa, resulting in the death of WRB on 11/16/13. Specifically, on multiple dates VA clinicians failed to timely diagnose and treat WRB's left lung cancer, which failure to timely diagnose and treat substantially diminished his chances of surviving his cancer.

6.3     On 9/8/11, WRB established as a patient of VA-Tulsa for primary health care. Included in his medical history recorded on that date is chronic obstructive pulmonary disease (COPD) first diagnosed "several years ago"; March 2011 cessation of fifty years of three pack per day smoking history; chronic cough; and a bronchitis hospitalization eight months earlier at a civilian hospital. Review of symptoms noted complaint of cough. Physical exam by VA-Tulsa nurse Sharalee B. Savage, ARNP, noted that breath sounds were "diminished in all sites, and "frequent cough." Assessment was COPD, dyslipidemia, allergic rhinitis, and hearing loss. Chest

x-ray was ordered. The VA-Tulsa radiologist, Altaf Husain, M.D.'s impression was: "Mild emphysema. No acute cardiopulmonary disease."

6.4     One week later, on 9/16/11, WRB presented for an unscheduled visit at VA-Tulsa with complaint of "pain in his left back with radiation anteriorly of 3 or 4 days duration." The intake nurse, Kittie M. Guerra, noted: "c/o left mid to lower back pain; last night states pain did go around side and to the front" and "also c/o still having problems with cough."  Physical exam by VA-Tulsa physician Lenard A. Poplin, M.D., noted: "Chest: breath sounds are decreased bilaterally – no rales or wheezes" and "Back: the patient is tender over the left paraspinous muscles and over the hands of the distal left ribs. There is no skin eruption present over the area of pain." Assessment was: "probable myositis of the lumbar muscles," "consider re-erupted herpes zoster," "doubt renal origin to the pain," and "upper respiratory tract infection." Conservative treatment (*i.e.*, heat treatment, Lortabs, and Zithromax) was offered.

6.5     One week later, on 9/23/11, WRB presented for an unscheduled visit at VA-Tulsa with complaint of "worsened back pain x 2 weeks." Charted in his "Review of Symptoms" was "shortness of breath, dyspnea, cough, wheezing." Physical exam by VA-Tulsa nurse Sharalee B. Savage, ARNP, noted: "paraspinous muscle tenderness midback left side." He was sent to the VA-Tulsa ER for an evaluation to rule out kidney stones. ER note included "intermittent left leg pain for about two weeks" and "history of kidney stone, and shortness of breath and cough" and patient complaint of "shortness of breath and cough" and "left flank pain." Physical exam by VA-Tulsa physician Jeffrey L. Anderson, D.O., noted: "Lungs: decreased bilaterally without wheezing or crackles at this time" and "Abdomen: good bowel sounds, soft, mildly tender over the left kidney, no guarding, no rebound." CT scan of his abdomen was ordered and interpreted by VA radiologist Altaf Husain, M.D., to be "unremarkable noncontrast CT of abdomen and pelvis."

6.6     VA-Tulsa radiologist Altaf Husain, M.D., erred in his benign interpretation of the patient's 9/23/11 abdominal CT. The correct interpretation of the 9/23/11 abdominal CT should have included a report of a 2.0 x 2.0 x 2.1 cm mass in the retroperitoneum immediately anterior to the left psoas muscle at the level of the mid portion of the left kidney.

6.7     Had the 9/23/11 abdominal CT been interpreted correctly, radiology standard of care would have required that the VA radiologist include a recommendation for a positron emission tomography (PET) scan to further evaluate the retroperitoneal mass. PET scans, which scan from the skull to the mid-thigh, are commonly used to detect cancer in symptomatic patients.

6.8     If the 9/23/11 abdominal CT had been correctly interpreted by Dr. Husain, and if, upon his correct interpretation of the CT scan, he had recommended a PET scan on 9/23/11, and if the recommended PET scan had been ordered by VA ER physician Jeffrey L. Anderson, D.O., the PET scan would likely have been benign respecting WRB's abdomen, but it would likely have been positive for cancerous lesions in WRB's left lung.

6.9     On 9/23/11, no PET scan was ordered for WRB.

6.10     Two weeks later, on 10/5/11, WRB presented at VA-Tulsa with complaint of "mid left side back pain x 1 month … radiation around to left side of mid abdomen; pain intermittent x one month." VA-Tulsa nurse, Sharalee B. Savage, ARNP, ordered thoracic and lumbar spine x-rays; diagnosed WRB with myositis; referred WRB to physical therapy; and prescribed NSAIDs and muscle relaxers in addition to WRB's pain medication regimen. The cancer in WRB's left lung remained undetected and, therefore, untreated.

6.11     The spine x-rays of 10/5/11, which revealed osteopenia and degenerative disc disease in the L3-L4 level, were reviewed by Sharalee B. Savage, ARNP, on 10/6/11. Nurse Savage recommended a DEXA (dual-energy x-ray absorptiometry) scan to measure bone mineral

7

density and over-the-counter calcium and vitamin D. The cancer in WRB's left lung remained undetected and, therefore, untreated.

6.12    The 11/2/11 DEXA scan was read to report osteoporosis. Vitamins and healthy lifestyle were recommended. The cancer in WRB's left lung went undetected, and therefore untreated.

6.13    On 11/2/11, WRB presented to physical therapy at VA-Tulsa. WRB was offered heal lifts to mitigate back pain. The cancer in WRB's left lung went undetected and, therefore, untreated.

6.14    WRB presented for physical therapy at VA-Tulsa for treatment of his back and side pain on multiple occasions – November 2, 9, 14, 18, 21, and 29, 2011, and December 1 and 6, 2011, each time with complaint of left side flank and abdominal pain. Physical therapist assessed on 11/9/11: "Trying to r/o ['rule-out'] any musculoskeletal issues… question if not kidney related to rib as the onset started after a coughing fit." VA-Tulsa physical therapist, Mary Kay Carter, addressed WRB's VA-Tulsa PCP in her 11/14/11 note: "Dr. Georgy – Just an FYI – I am concerned that his pain may not be back related … I am trying to r/o musculoskeletal problems and I will keep trying - I am concerned that it is something else as he really complains of abdominal pain on the left."  Nurse Carter charted the same concern again on 11/21/11. The cancer in WRB's left lung went undetected and, therefore, untreated, following each of these physical therapy sessions.

6.15    On 11/29/11, VA-Tulsa physical therapist Mary Kay Carter raised the issue of possible shingles in a note to VA-Tulsa primary care physician Ibrahim A. Georgy, M.D. "I am a little concerned about Mr. Brown's back pain. I cannot seem to come up with anything musculoskeletal … his pain is in the left flank area and wraps around to the front of the abdomen

to the belly button. Would it be possible that his pain is related to something like shingles?" The cancer in WRB's left lung went undetected and, therefore, untreated.

6.16     On 12/7/11, WRB presented to VA-Tulsa for primary care check-up with VA-Tulsa nurse practitioner Sharalee B. Savage, ARNP. Symptoms included "low back pain; continues to have burning/aching pain to left side radiating around to umbilicus … has been seeing physical therapy with intermittent relief of pain." Nurse Savage's assessment: COPD, dyslipidemia, allergic rhinitis, hearing loss, actinic keratosis. Nurse Savage's plan: r/o shingles neuropathy vs. low back pain. Nurse Savage ordered additional physical therapy, and Gabapentin to treat suspected shingles. The cancer in WRB's left lung went undetected and, therefore, untreated.

6.17     WRB presented for physical therapy treatment of his back and side pain at VA-Tulsa on multiple additional occasions: December 8, 13, 15, 20 and 29, 2011, and January 17, 2012. The cancer in WRB's left lung went undetected and, therefore, untreated, following each of these physical therapy sessions.

6.18     On 3/7/12, WRB presented to VA-Tulsa PCP Ibrahim A. Georgy, M.D., with complaint of "pain on left side of abdominal wall and low back pain." Dr. Georgy evaluated him. Conservative treatment was offered. The cancer in WRB's left lung went undetected and, therefore, untreated.

6.19     On 5/12/12, WRB presented emergently to a civilian hospital and was admitted due to shortness of breath and non-productive cough causing left flank pain response. He was discharged to following day. Final diagnosis: "Acute exacerbation of COPD; allergic rhinitis; and GERD." Conservative treatment was offered.

6.20     WRB presented to VA-Tulsa on 5/14/12, with complaint of left flank pain, and report of shortness of breath requiring civilian hospitalization two days ago. VA-Tulsa PCP Dr.

Georgy evaluated WRB. Dr. Georgy ordered pulmonary function tests. Conservative treatment was also offered.

6.21    WRB presented to the VA facility in Muskogee, Okla., on 6/4/12, for pulmonary function tests. Results include pulmonology opinion that "a restrictive process" may account for an abnormal test result. No follow-up was ordered by Tulsa-VA PCP Dr. Georgy. The cancer in WRB's left lung remained undetected, and therefore untreated.

6.22    WRB presented to VA-Tulsa Emergency Department on 6/7/12 with complaint of left flank pain and abdominal pain "on and off since September of last year" and "pain increased yesterday to 9/10." Abdominal x-ray ordered, and radiologist Mark Vaccaro, M.D., noted "vascular calcification in the left upper abdomen." Abdominal CT without contrast was ordered by VA emergency medicine physician Jeffrey L. Anderson, D.O., and interpreted by VA radiologist Mark Vaccaro, M.D. to be abnormal: "There is a 2.1 x 2.4 x 2.8 cm solid lobulated malignant-appearing mass in the retroperitoneum immediately anterior to the left psoas muscles at the level of the mid-portion of the left kidney. This mass is larger in size in comparison to the CT scan of the abdomen and pelvis dated 2011/09/23 at which time it measured 2.0 x 2.0 x. 2.1 cm." Dr. Vaccaro concluded: "suspicious for new malignancy; need follow-up."

6.23    VA-Tulsa emergency department physician Jeffrey L. Anderson, D.O., knew of the abnormal belly scan of 6/7/12. VA-Tulsa PCP Ibrahim A. Georgy, M.D., knew of the abnormal belly scan of 6/7/12. Neither physician ordered a PET scan.  The cancer in WRB's left lung went undetected, and therefore untreated.

6.24    Radiology standard of care required that PET scan be recommended to rule out cancer in WRB's abdomen, but none was recommended by the VA radiologist Dr. Vaccaro. Because no PET scan was recommended by the radiologist, and because *a fortiori* no PET scan

was ordered by the VA-Tulsa PCP or by the VA-Tulsa ED physician, the patient's left lung cancer remained undetected, and therefore untreated.

6.25     On 6/12/12, VA-Tulsa surgeon Carl W. Baker, III, D.O., ordered an abdominal CT with and without contrast. Abdominal CT with and without contrast was taken on 6/13/12. It was interpreted by VA-Tulsa radiologist Alexander Nguyen, M.D., to be: "enhancing solid left retroperitoneal mass. Diagnostic considerations include paraganglioma and sarcoma. Isolated lymphadenopathy is also a possibility. Consider tissue sampling."

6.26     On 6/19/12, WRB presented emergently to a civilian hospital and was admitted for one night for treatment of sepsis, community-acquired pneumonia, chronic COPD; and left chest wall/flank pain. Another CT of his abdomen was taken. An x-ray of the chest described: "patchy nodular appearing infiltrates are suggested in the left lung base with a small left pleural effusion. Coarsened interstitial markings throughout remaining lung zones are similar… follow up is recommended." On the civilian hospital discharge summary, it is noted that "close follow up with the VA Red Team, Dr. Georgy." It is further noted on the discharge summary that VA-Tulsa PCP Dr. Georgy was sent a copy.

6.27     No PET scan was ordered by VA-Tulsa physicians Dr. Georgy or by VA-Tulsa surgeon Dr. Baker. The cancer in WRB's left lung went undetected and, therefore, untreated.

6.28     On 6/26/12, a CT guided needle biopsy of WRB's left retroperitoneal mass was attempted at a civilian hospital. Pathology diagnosis by civilian pathologist was "fragments of skeletal muscle tissue" and "portions of fibrocollgenous tissue and clotted blood." The molecular diagnosis could not be performed due to a sampling issue.

6.29     On 7/9/12, WRB presented to VA-Tulsa physical therapist Mary Kay Carter. Carter noted: "Wife stated that he does have a tumor in his stomach and they did a biopsy at OSU but

11

only muscle was taken so the biopsy will need to be repeated. I instructed him to not use his tens unit until the biopsy is done as cancer is a contraindication for tens."

6.30    On 7/25/12, WRB presented emergently again to a civilian hospital, and was admitted overnight. His admission diagnosis was fever; chronic COPD; and chronic left lower quadrant pain. CT of the abdomen was ordered and reported: "images of the lower chest reveal mild bilateral pleural fluid, left greater than right." Chest x-ray was read: "In markings noted in the right lower chest. Compared to the previous study this may indicate a developing infiltrate. Follow-up to resolution would be recommended." and "There is a faint opacity questioned in the left upper lobe…slightly more prominent than the prior study follow-up of this finding will also be indicated." Final diagnosis was: pneumonia; abdominal pain; and chronic COPD. The "red team" at the VA were copied on the discharge summary.

6.31    On 7/31/12, VA surgeon Carl W. Baker, III, D.O., charted this impression regarding WRB's needle biopsy: "Retroperitoneal mass – perc biopsy consistent with muscle. Low grade rhabdomyosarcoma cannot currently be excluded." His plan was: "repeat imaging in three months." No PET scan was ordered by VA-Tulsa surgeon Carl W. Baker, III, D.O. No PET scan was ordered by VA-Tulsa PCP Ibrahim A. Georgy, M.D. The cancer in WRB's left lung went undetected and, therefore, untreated.

6.32    On 8/22/12, VA-Tulsa PCP Dr. Georgy saw WRB for complaint of abdominal pain and chronic back pain. Conservative treatment was given.

6.33    On 9/12/12, WRB was again admitted to a civilian hospital for one night for treatment of community-acquired pneumonia; chronic COPD; and chronic abdominal pain. Conservative treatment offered. "Red Team" at VA was copied on the discharge summary.

6.34     On 9/14/12, WRB presented to VA-Tulsa surgeon Dr. Baker to request a follow-up CT of his abdomen. Dr. Baker's impression: "left psoas mass with history of penetrating trauma 25 years ago." CT was taken and interpreted on 9/18/12. It was read to include "small amount of patchy lower lung field opacity/infiltrate. Small left pleural effusion noted."

6.35     On 10/11/12, WRB again went to the emergency room of a civilian hospital with shortness of breath. For the first time in WRB's medical timeline, a CT of the chest with contrast was performed. It was interpreted to include: "There is an approximately 2.8 x 2 cm irregular margin mass lesion in the left upper lobe extending towards the apex. Irregular margins and appearance suggest malignant neoplasm until proven otherwise." The lung cancer that went unseen and undetected for more than one year was discovered when civilian clinicians decided that a chest CT was warranted for WRB.

6.36     On 10/15/12, WRB went to his civilian PCP Joseph H. Koenig, M.D., for follow-up on his abnormal chest CT of 10/11/12. Civilian PCP Koenig referred WRB to civilian pulmonologist Andrew Gottehrer, M.D. Civilian pulmonologist Dr. Gottehrer advised patient on 11/29/12 that WRB's lung mass should be biopsied, and that consultation with a civilian interventional radiologist had opined that the chest mass could be biopsied.

6.37     The following day – 11/30/12 – WRB presented to VA-Tulsa PCP Ibrahim A. Georgy, M.D., and informed him about WRB's 10/11/12 abnormal chest CT, and about civilian recommendations for lung biopsy. Dr. Georgy told WRB that the CT results appeared to him to show old pneumonia scars. On 11/30/12, Dr. Georgy ordered a chest x-ray for WRB. The reason for the study was "lung mass per CXR at SFH [St. Francis Hospital] per patient." He also ordered another abdominal CT. VA-Tulsa radiologist Altaf Husain, M.D.'s impression of the 11/30/12

chest x-ray was: "Chest is negative for acute cardiopulmonary findings." No chest CT was ordered. No PET scan was ordered.

6.38    On 2/22/13, WRB received another abdominal CT on Dr. Georgy's order for six-month follow-up of 10/7/12 abdominal CT. Changes from the 10/7/12 abdominal CT (*i.e.*, new mass along portion of the posterior inferior thoracic cage) prompted Dr. Georgy – for the very first time – to order a chest CT.

6.39    On 3/20/13, a chest CT was obtained, and was read to be abnormal due to the presence of three lung masses: a 3.2 x 3.5 cm mass in the lateral left mid-lung with erosion into the left fifth or sixth rib, "highly suspicious for neoplasm;" 3.4 x 3.0 cm mass in the left upper medial lung, "likely neoplastic;" a 1.4 x 0.6 cm nodule in the base of the left lung; and other abnormalities in the left lung. In response, Dr. Georgy ordered a CT needle biopsy of WRB's left lung lesions.

6.40    On 4/4/13, a needle biopsy of one of WRB's left lung masses was performed.

6.41    On 4/5/13, pathologist Chetna Purohit, M.D., reported that the needle biopsy of the left lung lesion was "poorly differentiated non-small cell carcinoma." For the first time, WRB's left lung cancer was diagnosed. VA-Tulsa pulmonologist Neal Mask, M.D., ordered a PET scan.

6.42    On 4/12/13, a PET scan was performed. Its interpretation included identification of multiple lesions in WRB's left lung suspicious for cancer. The PET scan was also read to be benign regarding the patient's abdomen.

6.43    On 5/1/13, VA medical oncologist Atulkumar Dave, M.D., staged WRB's lung cancer to be stage IV disease, and concluded that the cancer was incurable. Dr. Georgy recommended palliative chemotherapy treatments.

6.44    On 11/16/13, WRB died. His death certificate reports the cause of death as: carcinoma of the lung.

## VII.

### Causes of Action Against the United States of America

### Medical Malpractice and Wrongful Death

7.1     Plaintiff incorporates the above-numbered paragraphs as if fully set forth herein.

7.2     The medical timeline for WRB described in paragraphs 6.1 through 6.44 describes an institutional failure by the Veterans Administration to provide competent and timely life-saving medical care to this veteran.

7.3     At all times relevant hereto, Defendant USA, by and through its agents, servants, and/or employees of the Department of Veterans Affairs who treated and cared for Plaintiff's decedent at VA-Tulsa were under a duty to properly and timely treat, care for, diagnose, monitor, evaluate, observe, admit for hospitalization, perform radiological studies, make appropriate referrals and obtain appropriate consultation for Plaintiff's decedent WRB throughout his time as a primary care patient of VA-Tulsa.

7.4     Defendant USA, by and through its agents, servants, and/or employees of the Department of Veterans Affairs who treated and cared for Plaintiff's decedent WRB at the VA-Tulsa violated the standards of care and were negligent in its care and treatment of WRB, including, but not limited to, the following.

7.5     On 9/23/11, VA-Tulsa radiologist Altaf Husain, M.D., misread WRB's abdominal CT. He failed to note two abnormal nodes in the patient's abdomen. Radiology standard of care required that he have noticed the two abnormal nodes, reported the presence of the two abnormal nodes, and recommended that a PET scan be ordered to determine the presence of a cancer. These

acts he failed to do. Had Dr. Husain recommended a PET scan on 9/23/11, it is likely that the clinician who had ordered the imaging – VA emergency medicine physician, Jeffrey L. Anderson, D.O. – would have ordered it. With a reasonable degree of medical oncology certainty, a PET scan on 9/23/11 would likely have disclosed the presence of cancer in WRB's left lung.

7.6     On 6/7/12, VA-Tulsa radiologist Mark Vaccaro, M.D., correctly interpreted WRB's abdominal CT to show the presence of two abnormal nodes in the abdomen, and he accurately re-read the 9/23/11 abdominal CT to be abnormal. Radiology standard of care required that Dr. Vaccaro recommend that it be followed-up with a PET scan to rule out the possibility of cancer. This he failed to do. Had Dr. Vaccaro recommended a PET scan on 6/7/12 it is likely that the clinician who ordered the imaging – VA-Tulsa emergency medicine physician, Jeffrey L. Anderson, D.O. – would have ordered it. With a reasonable degree of medical oncology certainty, a PET scan on 6/7/12 would have likely disclosed the presence of cancer in WRB's left lung.

7.7     Separate and apart from Dr. Vaccaro's errors and omissions noted in the foregoing paragraph, VA-Tulsa emergency medicine physician Jeffrey L. Anderson, D.O., knew of the abnormal abdominal CT of 6/7/12, and VA-Tulsa PCP Ibrahim A. Georgy, M.D., knew of the abnormal abdominal CT of 6/7/12, and each had a duty to further investigate Dr. Vaccaro's report of an abnormal image that was "suspicious for new malignancy; need follow-up." Emergency medicine standard of care required that Dr. Anderson order a PET scan. Family practice medicine standard of care required that Dr. Georgy order a PET scan. Both physicians departed from their respective standards of care when they did not order a PET scan. Had either physician ordered a PET scan, with a reasonable degree of medical oncology certainty, it likely would have disclosed the presence of WRB's left lung cancer.

7.8     On 7/27/12 when the "VA Red Team" received the discharge summary from WRB's 7/26/12 civilian hospitalization, standard-of-care for all members of the Team required that the abnormal imaging reports be followed-up with chest CT or with PET scan. Either diagnostic tool would have been read to be abnormal and would have led to an awareness, diagnosis, and treatment of WRB's left lung cancer.

7.9     On 7/31/12, when VA-Tulsa surgeon Carl W. Baker, III, D.O.  received the results of the biopsy of WRB's retroperitoneal mass, he ordered "repeat imaging in three months," and he charted that he would then offer either biopsy or surgery if there were changes. If Dr. Baker had an awareness of the abnormal imaging reported by civilian hospital clinicians five days ago, standard of care required that Dr. Baker order a chest CT or a PET scan on 7/31/12 to rule out the presence of cancer, and this he failed to do. If a chest CT had been ordered, it likely would have exposed the presence of lesions in his left lung. If a PET scan had been ordered, it likely would have disclosed the presence of WRB's left lobe lung cancer.

7.10     On 11/30/12, VA-Tulsa PCP Ibrahim A. Georgy, M.D., was aware that WRB had an abnormal chest CT performed at a civilian hospital on 10/11/12, and that a civilian pulmonologist on 11/29/12 had recommended a biopsy of the chest lesion. Dr. Georgy had a duty to order PET scan to rule out the presence of cancer, or to order a biopsy of one or more of the lesions that were detected on WRB's 10/11/12 chest CT. Dr. Georgy breached that duty when he failed to do so. With a reasonable degree of medical oncology and radiology certainty, a PET scan and/or lung biopsy on 11/30/12 would have described the presence of cancer in WRB's left lung.

7.11     When WRB's lung cancer was pathologically diagnosed on 5/13/13 to be stage IV disease, WRB's chances of surviving his cancer to live five or more years, with a reasonable degree of medical oncology certainty, was five percent (5%) or less.

7.12    When WRB's lung cancer was radiologically detected on chest CT imaging on 10/11/12 and reported to VA clinicians no later than 11/30/12, the likely stage of his lung cancer disease, with a reasonably degree of medical oncology certainty, was IIIA. Had WRB received prompt chemotherapy and radiation therapy treatments at that time, WRB's chances of living five or more years was within the range of 30% to 35%.

7.13    When WRB's abnormal abdominal CT was reported on 6/7/12, the probable stage of his latent lung cancer, with a reasonable degree of medical oncology certainty, was IA. Had WRB received prompt cancer treatment therapies commencing on that date, WRB's chances of living five or more years was within the range of 80% to 85%.

7.14    When WRB's abnormal abdominal CT was (incorrectly) reported on 9/23/11, the probable stage of his latent lung cancer, with a reasonable degree of medical oncology certainty, was IA. Had WRB received prompt cancer treatment therapies commencing on that date, WRB's chances of living five or more years were within the range of 80% to 85%.

7.15    On 5/12/20, JB was awarded Dependency and Indemnity Compensation (38 C.F.R. § 3.10) by the VA. That award was based in part on the opinion testimony of the VA's expert medical oncologist Robert Sklaroff, M.D., who testified therein: "It is at least as likely as not (a 50% or greater probability) that death from non-small cell lung cancer resulted from substandard VA medical treatment," and "In a chronic smoker … new lung symptoms warrant acquisition of a chest CT; a chest radiograph is insufficient … Either the PCP or the VA could easily have acquired the study and, to a reasonable degree of medical certainty, it would have revealed an early left upper lung lesion; this conclusion is predicated on the fact that – relatively soon thereafter – the lesion was found to have grown locally (evading a rib)."

7.16    Negligent medical care by VA-Tulsa and its employed physicians caused injury to WRB: diminishment in his chances of surviving non-small cell lung cancer; and his untimely and preventable death.

## VIII.

## Damages

8.1    **Survivorship Claim.** As a direct and proximate result of Defendant's negligent errors and/or omissions, Plaintiff, Joni Brown, as widow and Personal Representative of the Estate of WRB, and pursuant to Okla. Stat. tit. 12 § 1051, has incurred damages arising from such negligence, which include, but are not limited to: WRB's personal injury and death; diminishment of his chances of surviving his cancer; the pain suffered by WRB prior to his death; WRB's medical and hospital expenses; WRB's burial and funeral expenses; and all other categories of damages that may be permissible by law.

8.2    **Wrongful Death Claim.** As a direct and proximate result of Defendant's negligent acts and/or omissions, Plaintiff, Joni Brown, as widow and Personal Representative of the Estate of WRB, has incurred the damages enumerated at Okla. Stat. tit. 12 § 1053(B), to include:

- JB's loss of financial support

- JB's grief

- JB's loss of the society, services, companionship, and marriage relationship of her husband

- Grief of WRB's four children

- Loss of companionship by WRB's four children

- WRB's loss of chance of surviving his lung cancer

- WRB's pain, suffering and death

- WRB's hospital and medical expenses

- WRB's burial and funeral expenses

- All other categories of damages that may be permissible by law

8.3    Plaintiff's claim is limited by the *ad damnum* clause in her Form 95, line 12d, to be ten million dollars ($10 million).

### IX.

### Meaning of "Defendant"

9.1    In this Complaint, whenever the term "Defendant" is used, it means Defendant, Defendant's officers, agents, servants, employees, and/or representatives. Whenever in this Complaint it is alleged that Defendant did any act or thing, it is meant that Defendant, Defendant's officers, agents, servants, employees, and/or representatives did such act or thing, and that at the time of such act or thing was done, it was done with the full authorization and ratification of Defendant and was done in the normal routine course and scope of employment of Defendant's officers, agents, servants, employees, and/or representatives. Whenever in this Complaint, it is alleged that Defendant omitted any act or thing, it is meant that Defendant, Defendant's officers, agents, servants, employees, and/or representatives omitted such act or thing.

WHEREFORE, premises considered, the Plaintiff requests that the Defendant be summoned to appear and answer; that upon the final trial and hearing hereof, the Plaintiff, Joni Brown, as widow to and Personal Representative of her late husband, William Robert Brown, have judgment against the Defendant in an amount that will justly and fairly compensate WRB's widow and his children for all categories of damages that are set forth in Okla. Stat. tit 12 §§ 1051 and 1053; for the diminishment in WRB's survivability caused by the delay in diagnosing and treating lung cancer; and for all other damages available under the law; for post-judgment interest at the applicable legal rates; for all court costs incurred in this litigation; and for such other and further

relief, at law and equity, both general and special, to which the Plaintiff may show herself entitled and to which the Court believes Plaintiff may deserve.


                            RICHARD A. SHALLCROSS & ASSOCIATES, P.L.L.C.

                    By:     *s/Richard A. Shallcross*
                            Richard A. Shallcross, OBA #10016
                            The Wrightsman
                            1645 South Cheyenne Avenue
                            Tulsa, Oklahoma  74119
                            (918) 592-1645
                            (918) 585-9137 (fax)
                            Richard@shallcrosslaw.com

                            *Attorney for the Plaintiff,*
                            *Joan Brown, Individually and as Personal Representative*
                            *of the Estate of William Robert Brown*